Filed 8/2/16  P. v. Buenrrostro CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D067985 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD253505) |
| KLIEVER IVAN BUENRROSTRO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert F. O'Neill, Judge.  Affirmed in part; reversed in part; remanded for resentencing.

Buckley & Buckley and Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Garland and Alan L. Amann, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Kliever Ivan Buenrrostro appeals from a judgment of conviction after a jury convicted him of 10 counts of committing a lewd act upon a child (Pen. Code, § 288, subd. (a)).[1] The offenses occurred between 2002 and 2013 and involved six victims. As to each count, the jury found that Buenrrostro committed the offense against more than one victim (§ 667.61, subds. (b), (c) & (e)). The trial court sentenced Buenrrostro to 135 years to life in prison.

On appeal, Buenrrostro contends that the trial court should have dismissed several charges based on preaccusation delay. He argues that he was unduly prejudiced by the delay because witnesses' memories had faded and he was unable to conduct a full investigation, including locating witnesses. Additionally, Buenrrostro contends that the trial court erred in concluding that the delay in charging him was justified due to the fact that the investigation of the case was ongoing.

Buenrrostro also argues that the trial court abused its discretion by admitting childhood photographs of each victim to show what they looked like at or near the time of the offenses. Specifically, he contends that the photographs had no probative value and that the prosecutor used them to evoke an emotional reaction from the jury.

Finally, Buenrrostro argues that the trial court erred by imposing separate life sentences on counts 6 and 8 because the version of the "One Strike" law in effect at the

---

[1] Unless otherwise specified, all subsequent statutory references are to the Penal Code.

time he committed those offenses permitted only one indeterminate term for offenses committed during a single occasion. Buenrrostro contends that the trial court failed to apply the prior version of the One Strike law and requests that we remand the matter for the trial court to determine whether counts 6 and 8 occurred during a single occasion.

We reject Buenrrostro's claims concerning prejudicial preaccusation delay and admission of the photographs of the victims, but agree with his contention regarding sentencing error. We therefore affirm Buenrrostro's convictions and remand the case to the trial court to determine whether counts 6 and 8 occurred on a single occasion and, if necessary, resentence Buenrrostro on those counts.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Factual Background*

1. *M.V.*

In 2004, Buenrrostro married Daisy Cortez. They hosted a wedding celebration at their home. Daisy's 12-year-old cousin, M.V., attended the celebration. That night, M.V. went to sleep in Daisy's bedroom. M.V. woke up when she felt someone touching her. Buenrrostro had unbuttoned M.V.'s pants, lowered her pants and underwear, and was touching her above her vagina, underneath her underwear. Buenrrostro stopped when

---

[2] We provide only a summary of the evidence presented at trial. Our summary is intended to provide a sufficient background for consideration of Buenrrostro's claims on appeal, rather than to provide an exhaustive recitation of all of the evidence presented at trial.

someone knocked on the door. The next day, M.V. told her mother what had happened, but they did not report it to the police.

2. *M.Q.*

Daisy's cousin, M.Q., first met Buenrrostro when she was four or five years old. In 2002, during a visit to M.Q.'s house, Buenrrostro entered her bedroom, told her to lie down on the floor, pulled her pants down, and rubbed his penis on her vagina. Buenrrostro later took M.Q. to a gas station to buy candy. When they returned to M.Q.'s house, Buenrrostro parked the car, tilted the seats back, and rubbed M.Q.'s vaginal area over her clothing.

A few months later, M.Q. went with her family to Buenrrostro's residence. While M.Q. was playing in a bedroom, Buenrrostro entered the room and rubbed her vaginal area over her clothing. He did this multiple times over the course of that evening.

When M.Q. was in high school, her mother placed her in counseling. After M.Q. revealed that she had been molested, her counselor made a report to Child Protective Services. In 2013, the San Diego Police Department interviewed M.Q., who recounted three incidents of molestation by Buenrrostro.

3. *C.V.*

In 2004, when C.V. was approximately eight or nine years old, she lived two houses away from Buenrrostro and Daisy. C.V. and her brothers occasionally visited Buenrrostro's residence to play video games and see his puppies. On one occasion, C.V. was in a bedroom while her brothers were in the living room. Buenrrostro shut the bedroom door and proceeded to kiss C.V. on her mouth, neck and chest. Buenrrostro

4

then pulled C.V.'s pants down and orally copulated her. C.V. yelled, but Buenrrostro restrained her and told her to be quiet.

On another occasion, Buenrrostro tried to pull down C.V.'s shorts and put his penis inside her vagina, but was unsuccessful. He also tried to have sexual intercourse with her on other occasions. Another time, Buenrrostro tried to kiss C.V. and touch her vagina underneath her clothing. Buenrrostro also exposed his penis to C.V. and attempted to force her to orally copulate him multiple times.

In 2005, Buenrrostro moved to Mexico. When Buenrrostro returned to San Diego in 2009, C.V. saw him and was scared. At that point, C.V. told her mother about the molestations. C.V.'s mother called the police. When the police interviewed C.V., she disclosed multiple incidents of molestation by Buenrrostro. The police submitted the case to the district attorney's office.

4. *I.C. and Y.M.*

I.C. and Y.M. are cousins. Buenrrostro was a friend of Y.M.'s uncle. Around 2004, while Y.M. was watching television at her father's home, Buenrrostro entered the room, lay down next to Y.M., and touched her vagina underneath her clothing. No one else was in the room at that time. Y.M. told her mother what had happened. Y.M.'s mother did not report the incident to the police.

In early 2005, Y.M.'s mother hosted a party at their home. I.C., who was approximately six years old at the time, attended the party. During the party, Buenrrostro inappropriately touched I.C. at least four times, including touching her butt and vagina outside of her clothing.

5

When Buenrrostro left the party, I.C. told her mother about how Buenrrostro had touched her. Y.M. informed I.C.'s mother that Buenrrostro had molested her a year earlier. I.C.'s mother called the police.

I.C. and Y.M. told officers that Buenrrostro had touched them inappropriately. During a forensic interview, I.C. explained that Buenrrostro had touched her butt and vaginal area. In a separate forensic interview, Y.M. stated that Buenrrostro had touched her vaginal area. The San Diego Police Department submitted a report of the incidents to the district attorney's office.

5. *A.C.*

In August 2013, 11-year-old A.C. was taking a shower when the bathroom window broke, cutting her arm and head. A.C. put on her underwear, covered herself with a towel, and yelled for her brother to help her. Buenrrostro, who had been living in the garage of the residence where A.C. and her family lived, entered the bathroom and closed the door. Buenrrostro treated A.C.'s injuries and then rubbed her vagina underneath her underwear and kissed and licked her stomach.

In November 2013, A.C. told a counselor at her school what Buenrrostro had done to her. The counselor reported the incident to Child Protective Services. A Child Protective Services social worker interviewed A.C. A.C. told the social worker that Buenrrostro had touched her vagina and kissed her breast area. The social worker referred the case to the San Diego Police Department. In January 2014, the San Diego Police Department arrested Buenrrostro.

B. *Procedural Background*

In January 2014, the People filed a complaint charging Buenrrostro with two counts of lewd and lascivious acts committed upon A.C. Approximately two weeks later, the People amended the complaint to add three additional counts of lewd and lascivious acts committed upon Y.M. and I.C. Shortly thereafter, the district attorney's office reassessed the allegations of molestation pertaining to C.V., which it had rejected in 2010. The People then issued a separate case in February 2014, charging Buenrrostro with sexual acts committed against C.V. Those charges were consolidated with the other, previously filed charges against Buenrrostro.

While investigating M.Q.'s allegations of molestation, which had been reported to the police in September 2013, the police learned that Buenrrostro had molested M.V. in 2004. M.V. confirmed that Buenrrostro had molested her. In April 2014, the district attorney's office filed charges against Buenrrostro for the lewd and lascivious acts committed upon M.Q. and M.V. Those charges were consolidated with the other charges against Buenrrostro.

III.

DISCUSSION

A. *Preaccusation delay*

Buenrrostro contends that the trial court should have granted his motion to dismiss the counts pertaining to I.C., Y.M., and C.V. on the basis that the preaccusation delay was unjustified and prejudicial, denying him due process and a fair trial under the state

7

and federal Constitutions.[3]  According to Buenrrostro, the delay prejudiced him because witnesses' memories had faded and he was unable to locate witnesses.  Additionally, Buenrrostro argues that the trial court erred in concluding that the delay in charging was justified by the fact that the investigation was ongoing because nothing had changed between the time the district attorney's office originally declined to prosecute the charges and the time it reexamined the charges in 2014.

    1.  *Applicable Law*

"Delay in prosecution that occurs before the accused is arrested or the complaint is filed may constitute a denial of the right to a fair trial and to due process of law under the state and federal Constitutions.  A defendant seeking to dismiss a charge on this ground must demonstrate prejudice arising from the delay.  The prosecution may offer justification for the delay, and the court considering a motion to dismiss balances the harm to the defendant against the justification for the delay.  [Citations.]  In addition, a claim based upon the federal Constitution requires a showing that the delay was undertaken to gain a tactical advantage over the defendant."  (*People v. Catlin* (2001) 26 Cal.4th 81, 107 (*Catlin*).)

"Under this balancing test, the trial court undertakes a delicate weighing of interests to determine whether preaccusation delay has deprived the defendant of due process: '[A] minimal showing of prejudice may require dismissal if the proffered

---

3    Prior to trial, Buenrrostro moved to dismiss all charges against him based on preaccusation delay.  On appeal, Buenrrostro restricts his argument to the charges on which he was convicted pertaining to I.C. (count 3), Y.M. (count 5), and C.V. (counts 6 and 8).  Accordingly, we limit our discussion to the challenged counts.

8

justification for delay is insubstantial. By the same token, the more reasonable the delay, the more prejudice the defense would have to show to require dismissal.' " (*People v. New* (2008) 163 Cal.App.4th 442, 459-460 (*New*).)

We review the trial court's ruling on a motion to dismiss based on preaccusation delay for abuse of discretion, deferring to any underlying factual findings made by the court so long as they are supported by substantial evidence. (*People v. Cowan* (2010) 50 Cal.4th 401, 431 (*Cowan*).) Whether a delay was prejudicial to the defendant is a question of fact. (*People v. Dunn-Gonzalez* (1996) 47 Cal.App.4th 899, 911-912.) Prejudice may not be presumed. (*People v. Abel* (2012) 53 Cal.4th 891, 908-909; *People v. Nelson* (2008) 43 Cal.4th 1242, 1250 (*Nelson*).)

2. *Additional background regarding Buenrrostro's motion to dismiss*

In March 2005, I.C. and Y.M. told officers that Buenrrostro had molested them. The police detained Buenrrostro pending further investigation of the matter. The police subsequently investigated I.C.'s and Y.M.'s allegations, including conducting forensic interviews of the victims and interviewing witnesses, and submitted the cases to the district attorney's office. In late March 2005, the district attorney's office declined to prosecute the cases.

In 2009, when C.V. was 13 years old, the police investigated her claims that Buenrrostro had molested her in 2004. After interviewing Buenrrostro and conducting a forensic interview of C.V., the police submitted the case to the district attorney's office. In February 2010, the district attorney's office declined to prosecute the matter.

9

In 2014, the police arrested Buenrrostro for crimes against A.C. When the district attorney's office reviewed A.C.'s case, it reexamined the cases pertaining to I.C., Y.M., and C.V. and decided to charge Buenrrostro with crimes against those victims as well as A.C.

Prior to trial, Buenrrostro moved to dismiss the charges against him pertaining to I.C., Y.M., and C.V. According to Buenrrostro, he could not remember possible witnesses who may have been present during the alleged crimes and many defense witnesses were no longer available to testify because they had died, could not be located, or had been deported.

Buenrrostro also argued that crucial evidence had been lost or destroyed as a result of a "substandard law enforcement investigation." According to Buenrrostro, this evidence included DNA that could have been collected through medical examinations and witnesses who could have been located if the police had interviewed neighbors and canvassed the surrounding area.

Buenrrostro further argued that the prosecution did not have a justification for the delay. Specifically, he contended that the police had stopped investigating the case, and that they had not located additional witnesses or found new evidence that had been previously unavailable.

The trial court denied Buenrrostro's motion without prejudice so that he could raise it again after the court heard the evidence at trial. After the close of evidence, Buenrrostro renewed his motion. Buenrrostro again argued that the delay in charging him had hindered his defense because he was unable to locate witnesses and favorable

evidence. Defense counsel argued, "[i]f there wasn't the several years' delay, I bet our investigator would have found people that are non-family that were there to maybe corroborate statements that were helpful to [Buenrrostro]."

The trial court denied Buenrrostro's motion, concluding that his claim of prejudice was unsubstantiated because the evidence presented at trial had not revealed any potential defense witnesses and Buenrrostro had not identified any lost witnesses nor described any efforts to locate such witnesses. The court further concluded that the prosecution had not caused the delay and that "[t]he case has remained under investigation."

3. *The trial court acted within its discretion in denying Buenrrostro's motion to dismiss*

a. *Prejudice*

Buenrrostro argues that the preaccusation delay prejudiced him because witnesses' memories had faded and the delay deprived him of the ability to locate witnesses who could provide testimony that would impeach the victims and otherwise exculpate him.

" '[P]rejudice [for preaccusation delay claims] may be shown by loss of material witnesses due to lapse of time [citation] or loss of evidence because of fading memory attributable to the delay.' " (*Catlin*, *supra*, 26 Cal.4th at p. 107.) However, "*speculation* about prejudice because potential witnesses' memories have failed or because witnesses and evidence are now unavailable is insufficient to discharge defendant's burden. [Citation.] A particular factual context must be established in which a specific claim of prejudice can be evaluated." (*Shleffar v. Superior Court* (1986) 178 Cal.App.3d 937, 946, italics added.)

11

Buenrrostro's prejudice claim is speculative. He never provided the trial court with specific information as to witnesses who were unavailable or of efforts to locate witnesses. Further, he did not provide any details or a factual context for the purported exculpatory evidence that these witnesses could have provided. Instead, defense counsel merely argued, "[i]f there wasn't the several years' delay, I *bet* our investigator would have found people that are non-family that were there to *maybe* corroborate statements that were helpful to [him]." Buenrrostro did not elaborate concerning any statements that were helpful to him. Counsel's "bet" that he could have found helpful witnesses if the charges had been brought at an earlier date does not constitute a sufficient showing of prejudice. (*People v. Conrad* (2006) 145 Cal.App.4th 1175, 1184 [defendant's claim that a witness "could have" testified to certain facts was speculation and insufficient to establish prejudice].)

Buenrrostro argued that he could not make specific representations about potential witnesses and what they would say because the preaccusation delay prevented him from ascertaining the identities of those witnesses. However, Buenrrostro was aware of I.C.'s and Y.M.'s accusations near the time the crimes took place and thus, he had an incentive to record exculpatory information at that time. I.C.'s mother confronted Buenrrostro on the night he inappropriately touched I.C. That same night, I.C. told the police about what had occurred and Y.M. reported that Buenrrostro had inappropriately touched her a year earlier. Buenrrostro knew of these allegations against him because the police detained him at the time. Under these circumstances, Buenrrostro cannot persuasively claim that the preaccusation delay prejudiced him because he could have recorded information

12

about any potential exculpatory witnesses and evidence at or near the time the accusations were made. (*Cowan*, *supra*, 50 Cal.4th at p. 432 [concluding that defendant did not suffer prejudice because he knew he was a suspect and "had an incentive to record any exculpatory information he had regarding his whereabouts, the property, or the identity of alibi witnesses."].)

Additionally, there was no evidence presented at trial suggesting that there were any witnesses who could have provided exonerating evidence. It is undisputed that Buenrrostro was present at the locations and times of the acts charged. The crimes occurred in private, outside the presence of others. Thus, it is unlikely that any witnesses could have provided evidence demonstrating that the crimes did not in fact occur. (See *People v. Cordova* (2015) 62 Cal.4th 104, 120 [claimed prejudice is speculative when "[n]o reason exists to believe witnesses would have supplied exonerating, rather than incriminating, evidence, or any evidence at all."].)

Buenrrostro also argues that he was prejudiced because the victims' memories had faded over the years. Specifically, he contends that I.C. had told a variety of different stories about what Buenrrostro had done to her and how many times it happened, Y.M. could not recall details about the incident, and C.V. was uncertain about the exact time period when the events occurred. According to Buenrrostro, he could have more fully explored conflicts in these victims' testimony if he had been able to conduct a contemporaneous investigation.

I.C. testified to specific details about what Buenrrostro had done to her and where the incidents took place. She underwent a recorded forensic interview two days after

13

Buenrrostro's crimes against her in March 2005. Although there were some discrepancies between I.C.'s statements near the time of the crimes and her trial testimony, Buenrrostro has not identified how a contemporaneous investigation would have assisted him in explaining the discrepancies. He merely argues that a contemporaneous investigation would have aided him in "providing information about who [he] was years earlier." However, as previously noted, Buenrrostro was aware of I.C.'s accusations against him in 2005 and thus had an incentive to record any exculpatory information.

At trial, Y.M. could not recall certain details about Buenrrostro's crimes against her, particularly the dates when the crimes occurred. She could not remember the same details in her forensic interview that took place approximately one year after the crimes. Thus, even if the prosecution would have charged Buenrrostro in 2005 with the crimes he committed against Y.M., he would not have had any more specific information concerning the dates of crimes at that time.

The same is true with respect to C.V. Although C.V. could not recall precise details about the dates when the crimes occurred, she testified that the first incident occurred when she was eight or nine years old, which was between August 2003 and August 2005, and that all of the crimes took place before Buenrrostro moved to Mexico in 2005. C.V. did not report the abuse until 2009, and had trouble remembering details about dates during her 2009 forensic interview. As the prosecution's expert explained, children reporting sexual abuse often delay reporting and are unable to recall specific dates or to report incidents in a sequential manner. Therefore, even if the prosecution had moved forward with the case in 2009, C.V. would not have been able to recall the exact

14

time period during which the molestations occurred. Buenrrostro thus has not shown that he was prejudiced by the delay in charging the offenses against C.V. due to her inability to recall details of the offenses.

Buenrrostro next contends that the preaccusation delay prevented him from "conduct[ing] contemporaneous interviews to support his *Stoll* defense." In *People v. Stoll* (1989) 49 Cal.3d 1136, the California Supreme Court explained that Evidence Code section 1102 "allows an accused to present expert opinion testimony . . . to indicate his nondisposition to commit a charged sex offense." (*Id*. at p. 1153.) At trial, Buenrrostro presented several character witnesses who testified that they had never seen him touch children inappropriately. He also presented expert testimony from a psychologist who opined that Buenrrostro was not sexually deviant or a pedophile and that he did not demonstrate the red flags typically found in cases of pedophilia or sexual deviance. Buenrrostro has offered nothing more than a conclusory claim that the preaccusation delay hampered his *Stoll* defense. He does not explain how additional witnesses could have supplemented the expert opinion's testimony concerning Buenrrostro's lack of predisposition to commit the charged sex offenses. Accordingly, he has failed to establish prejudice in this regard.

b. *Justification*

Even if Buenrrostro had made a showing of prejudice, the trial court did not abuse its discretion by impliedly concluding that the prosecution's justification for the delay outweighed any prejudice.

In an attempt to demonstrate that the prosecution was not justified in charging him with crimes committed against I.C., Y.M., and C.V., Buenrrostro asserts that the police neither continued to investigate those crimes nor discovered new evidence between the time the district attorney's office originally declined to prosecute the matters and when he was charged in 2014. Buenrrostro asserts that the prosecution charged him with the earlier crimes only as a result of its investigation of A.C.'s case. He argues that this is not sufficient to support the trial court's conclusion that there was an ongoing investigation.

Buenrrostro's arguments are not persuasive. In *Catlin*, our Supreme Court explained:

> " 'Prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. . . . Investigative delay is fundamentally unlike delay undertaken by the government solely to gain tactical advantage over an accused. . . . A prosecutor abides by elementary standards of fair play and decency by refusing to seek indictments until he or she is completely satisfied the defendant should be prosecuted and the office of the prosecutor will be able to promptly establish guilt beyond a reasonable doubt.' " (*Catlin*, *supra*, 26 Cal.4th at p. 109.)

In that case, the court concluded that filing murder charges in 1985 alleging that the defendant had murdered his wife in 1976 by poisoning her with paraquat did not violate due process. The court reasoned that the evidence available prior to 1984 made it

16

"extremely difficult or impossible to make out a case against defendant at or near the time of the murder," but that "[b]y the time defendant was charged, of course, additional evidence of his guilt had emerged—*particularly his involvement in the paraquat poisoning of two more persons*." (*Catlin*, *supra*, 26 Cal.4th at p. 109, italics added.)

Contrary to Buenrrostro's argument, something significant did occur between the time the district attorney's office originally reviewed the allegations concerning I.C., Y.M., and C.V. and the time it charged Buenrrostro with those crimes in 2014. Specifically, another victim, A.C., reported that Buenrrostro molested her. This fact constitutes new evidence that corroborates the other charges. (See *New*, *supra*, 163 Cal.App.4th at p. 465 [delay in charging defendant with the murder of his first wife was justified because new evidence had emerged to establish that defendant shot her, namely, defendant's third wife also died in their home from a gunshot wound]; *Catlin*, *supra*, 26 Cal.4th at p. 109.)

Evidence Code section 1108 permits courts to admit propensity evidence in sex offense cases. " ' "This includes consideration of the other sexual offenses as evidence of the defendant's disposition to commit such crimes, and for its bearing on the probability or improbability that the defendant has been falsely or mistakenly accused of such an offense." ' " (*People v. Falsetta* (1999) 21 Cal.4th 903, 912.) " 'The Legislature has determined the need for this evidence is "critical" given the serious and secretive nature of sex crimes and the often resulting credibility contest at trial.' " (*Id.* at p. 911.) Accordingly, evidence that Buenrrostro committed sex offenses against A.C. could be used to establish that he committed sex offenses against I.C., Y.M., and C.V., making

17

those cases stronger than they were when the district attorney's office originally assessed them.

The police were not actively seeking new witnesses or evidence, but they obtained new evidence when A.C. reported Buenrrostro's crimes against her. When the prosecution waits to bring charges until it has sufficient evidence to support those charges, "[t]he delay [is] investigative delay, nothing else." (*People v. Nelson, supra,* 43 Cal.4th at p. 1256 [twenty-six-year delay in charging defendant with murder was justified because the evidence was insufficient to charge him until forensic technology and funding for cold case investigations became available to identify defendant as a suspect and establish his guilt through a DNA comparison analysis].)

"Although under California law a defendant need not show that the preaccusation delay was undertaken to give the prosecution a tactical advantage, the absence of such evidence is nevertheless relevant in the weighing of the prejudice to the defendant against the justification for the delay." (*New, supra*, 163 Cal.App.4th at p. 466.) In this case, there was no indication that the delay occurred because the prosecution was attempting to gain a tactical advantage. Instead, A.C.'s case caused the prosecution to reexamine prior cases involving Buenrrostro. With A.C.'s case, the prosecution had additional evidence that was relevant to the older crimes and, at that point, it chose to charge Buenrrostro with the older crimes, as well as the crimes committed against A.C. "A court should not second-guess the prosecution's decision regarding whether sufficient evidence exists to warrant bringing charges." (*Nelson, supra*, 43 Cal.4th at p. 1256.) Preaccusation delay is justified where, as here, the prosecution discovers new evidence that is relevant to older

18

uncharged crimes and that strengthens the evidence supporting prosecution of those crimes. (See *Catlin*, *supra*, 26 Cal.4th at p. 109; *New*, *supra*, 163 Cal.App.4th at p. 465.)

The trial court did not abuse its discretion by impliedly concluding that the justification for the delay in charging Buenrrostro with the crimes against I.C., Y.M., and C.V. outweighed any prejudice that Buenrrostro may have suffered.

B. *The trial court did not abuse its discretion by admitting photographs of the victims as they appeared at the time of Buenrrostro's crimes against them*

Buenrrostro challenges the trial court's admission of photographs of the victims depicting them at the ages they were at the time of the crimes. Buenrrostro contends that the trial court abused its discretion under Evidence Code section 352 because the photographs had no probative value and were unduly prejudicial. He further contends that he was denied due process and a fair trial because the photographs improperly evoked sympathy and an emotional reaction from the jury.

1. *Additional Background*

Prior to trial, Buenrrostro objected under Evidence Code section 352 to the prosecution's proffer of photographs of the victims as they appeared at the time of Buenrrostro's crimes against them. The prosecutor argued that the photographs were relevant to show the victims' size, appearance, and vulnerability at the time the crimes occurred. The court reviewed the photographs and allowed the prosecution to admit one photograph of each victim.

The prosecutor showed the photographs to the jury during her opening statement. While doing so, the prosecutor described the victims as "a group of sweet, innocent little

19

girls" who were "the objects of [Buenrrostro's] sexually perverse desires." The prosecutor showed the photographs again during the testimony of each victim or a family member. At the close of evidence, Buenrrostro renewed his objection. The trial court admitted the photographs, concluding that their probative value exceeded their prejudicial effect.

During closing argument, the prosecutor stated that she had introduced the photographs to "demonstrate how small and impressionable and delicate these girls were when they were molested."

2. *Relevant law*

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "[T]he test for prejudice under Evidence Code section 352 is not whether the evidence in question undermines the defense or helps demonstrate guilt, but is whether the evidence inflames the jurors' emotions, motivating them to use the information, not to evaluate logically the point upon which it is relevant, but to reward or punish the defense because of the jurors' emotional reaction." (*People v. Valdez* (2012) 55 Cal.4th 82, 145.) "Admission of photographs of the victims is within the sound discretion of the trial court, and that discretion will not be disturbed unless it is manifest that the probative value of the evidence is outweighed by its prejudicial effect." (*People v. Bean* (1988) 46 Cal.3d 919, 943.)

20

3. *Application*

The victims' photographs were relevant to aid the jurors in judging the victims' sizes, ages, and vulnerability at the time of the crimes. The victims had matured significantly by the time they testified because the crimes, other than those against A.C., had occurred more than a decade prior to trial. M.V. was 12 years old at the time of the crimes against her and 22 years old at trial. Her photograph depicted her at the age of approximately 13. M.Q. was around five years old at the time of the crimes against her and 17 years old at the time of trial. Her photograph depicted her at the age of five. Y.M. and I.C. were five and six years old, respectively, at the time of the crimes, and 16 and 17 years old at trial. Their photographs depicted them at five and seven years old. C.V. was eight or nine years old at the time of the crimes and 19 years old at trial. Her photograph depicted her at eight or nine years old. There is a significant difference in size, age, and vulnerability of young children compared to the teenagers and young adults who testified before the jury. The photographs were thus relevant to aid the jury in evaluating the victims at the time of the crimes.

The photographs were also relevant to assist the jury in assessing the victims' credibility, which was particularly important in a case such as this one because of "the secretive nature of sex crimes and the often resulting credibility contest at trial." (*Falsetta*, *supra*, 21 Cal.4th at p. 911.) As the prosecution's expert explained, children reporting sexual abuse are often unable to provide details about the crimes and can appear inconsistent because "they don't necessarily identify things that adults would." The photographs aptly reminded the jury to evaluate the victims' comprehension of events,

21

recall, and ability to relay details as children rather than as the young adults who appeared at trial.

Although there was some risk that the childhood photographs could generate sympathy for the victims, the trial court could reasonably conclude that any resulting prejudice was slight compared to the probative value of the evidence. "The possibility that [photographic evidence] generate[s] sympathy for the victims is not enough, by itself, to compel its exclusion if [the photographs are] otherwise relevant." (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1230 [admission of a photograph showing a murder and assault victim on vacation was not error despite defendant's contention that it generated sympathy for the victims because the photograph was relevant]; see also *Cowan, supra*, Cal.4th at p. 475 [admission of post-mortem photographs of frail, elderly murder victims was not an abuse of discretion because the evidence was relevant and sympathy for the victim is not sufficient to require exclusion].) In this case, the prosecution showed only one photograph of each victim, and the court instructed the jury that it must not let sympathy influence its decision (CALCRIM No. 200). Further, Buenrrostro has not identified anything uniquely inflammatory about the photographs such that they would have motivated the jury to use the evidence for an improper purpose and disregard the court's instruction to not let sympathy play into the jury's decision. The trial court did not abuse its discretion in concluding that the photographs of the victims as children were admissible under Evidence Code section 352.

22

4. *Admission of the evidence as a violation of Buenrrostro's rights to due process and a fair trial*

Buenrrostro contends that admission of the photographs violated his right to due process and rendered his trial fundamentally unfair. Because we have concluded that the evidence was properly admitted, we reject Buenrrostro's contention that the admission of this evidence violated his rights to due process of law and a fair trial.

To the extent Buenrrostro argues that the prosecutor committed misconduct by using the photographs to evoke an improper emotional reaction in the jury while describing the victims as "sweet, innocent little girls" who were "the objects of [Buenrrostro's] sexually perverse desires," we conclude that Buenrrostro forfeited the argument by failing to raise this objection at trial. (*People v. Earp* (1999)20 Cal.4th 826, 858 [" 'To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition.' "].)

C. *Remand is required for the trial court to determine whether counts 6 and 8 were committed on a "single occasion" under former section 667.61, subdivision (g)*

Buenrrostro contends that the trial court misunderstood its sentencing discretion when it sentenced him to consecutive terms of 15 years to life on his crimes against C.V. (counts 6 and 8). Specifically, he argues that the trial court erred in failing to apply the version of section 667.61, subdivision (g), that was in effect in 2004 and 2005, the time period during which he committed the charged offenses. Buenrrostro further contends that the trial court could not have imposed One Strike law sentences on both counts 6 and 8 under former section 667.61, subdivision (g), because the offenses were committed on a

23

"single occasion" as that term was interpreted in *People v. Jones* (2001) 25 Cal.4th 98, 107 (*Jones*).

The People concede that because counts 6 and 8 arguably were committed on a single occasion, former section 667.61, subdivision (g), may have authorized only one indeterminate term of 15 years to life. The parties agree that we should remand the case to the trial court to determine whether counts 6 and 8 occurred on a single occasion.

1. *Additional Background*

Counts 6 and 8 alleged that Buenrrostro committed lewd and lascivious acts by putting his mouth on C.V.'s vagina and by kissing her. The second amended consolidated information distinguished the counts pertaining to C.V. by stating that count 6 was for "mouth to vagina - first occasion" and count 8 was for "kiss - first occasion."

At trial, C.V. testified that on the first occasion when Buenrrostro inappropriately touched her, she was eight or nine years old, which was between August 2003 and August 2005. On that occasion, Buenrrostro entered a bedroom, shut the door, and proceeded to kiss C.V. on her mouth, neck, and chest. Buenrrostro then pulled C.V.'s pants down and orally copulated her.

The jury convicted Buenrrostro on counts 6 and 8 of committing lewd and lascivious conduct against C.V. The jury also convicted Buenrrostro on eight other counts of lewd and lascivious conduct pertaining to his crimes against A.C., I.C., Y.M., M.Q. and M.V. On each count, the jury found that Buenrrostro had committed lewd and lascivious conduct against more than victim.

24

At sentencing, Buenrrostro requested that the trial court impose concurrent sentences, to the extent possible. The trial court stated that it had no "persuasive authority that would allow [it] to sentence concurrent. It is 15 to life terms." The trial court went on to state that in light of the multiple victim findings, it was required to impose terms of 15 years to life, running consecutively. The trial court then sentenced Buenrrostro to 10 terms of 15 years to life. Although the trial court had stated it did not have authority to impose concurrent sentences, it imposed concurrent sentences on counts 1 and 2 and ran the remaining sentences consecutively (counts 3, 5, 6, 8, 10-13). In imposing the sentences, the court did not reference the applicability of former section 667.61, subdivision (g).

2. *Governing law*

At the time Buenrrostro committed counts 6 and 8, the One Strike law provided that the applicable prison term "shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion." (§ 667.61, former subd. (g).) Our Supreme Court interpreted the phrase "during a single occasion" in that version of the One Strike law to mean that the offenses "were committed in close temporal and spatial proximity." (*Jones*, *supra*, 25 Cal.4th at p. 107.) Applying that definition, the Supreme Court indicated that "a sequence of sexual assaults by defendant against one victim that occurred during an uninterrupted time frame and in a single location" should be determined to have occurred on a single occasion within the meaning of the statute. (*Id*. at pp. 101, 107 [sexual assaults were committed on a single occasion when the defendant performed numerous sex acts on the victim in a car over the span of

25

at least one and a half hours].)  Former section 667.61 did not mandate that sentences imposed under that section be served consecutively.  (*People v. Rodriguez* (2005) 130 Cal.App.4th 1257, 1262.)

In 2006, the Legislature superseded the standard set forth in *Jones* by amending the One Strike law to delete section 667.61, subdivision (g) as it formerly appeared and to insert subdivision (i), which in relevant part provides that for the applicable offenses, "the court shall impose a consecutive sentence for each offense that results in a conviction under this section if the crimes . . . involve the same victim on separate occasions as defined in subdivision (d) of Section 667.6."  (§ 667.61, subd. (i); Stats. 2006, ch. 337, § 33.)  In turn, section 667.6, subdivision (d), defines "separate occasions" as follows: "In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."  (§ 667.6, subd. (d).)

3. *Application*

It appears that the trial court did not fully exercise its sentencing discretion.  The trial court made no reference to former section 667.61, subdivision (g), or to the standard for determining whether multiple sex offenses occurred on a "single occasion" for

26

purposes of that statute, as established in *Jones*. Despite the evidence suggesting that counts 6 and 8 may have occurred on a single occasion, the court did not engage in an analysis of whether those crimes occurred in close spatial or temporal proximity. Instead, the court concluded that it was required to impose consecutive terms of 15 years to life and imposed those terms on counts 6 and 8.

In the time frame between 2003 and 2005 when Buenrrostro committed lewd and lascivious conduct on C.V., the Legislature had not adopted section 667.61, subdivision (i). The law in effect at that time, former section 667.61, subdivision (g), provided that only one indeterminate, one strike term could be imposed for any offenses committed against a single victim on a single occasion. For any other offense committed during the single occasion, former section 667.61, subdivision (g), required that "[t]erms . . . be imposed as authorized under any other law."

Accordingly, on remand, the trial court shall determine whether counts 6 and 8 were committed on a "single occasion" under former section 667.61, subdivision (g), such that Buenrrostro may not receive a One Strike law sentence on both counts. If the court concludes that the offenses were committed on a "single occasion" under former section 667.61, subdivision (g), the court shall impose a single One Strike law sentence on one of the two counts and impose a term "authorized elsewhere in the Penal Code" on the other count. (*People v. Stewart* (2004) 119 Cal.App.4th 163, 175.)

IV.

DISPOSITION

The convictions are affirmed. The judgment is reversed and the matter is remanded for resentencing in accordance with part III.C, *ante.*

AARON, J.

WE CONCUR:


HUFFMAN, Acting P. J.


IRION, J.